# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| Daniel Lilienfeld, <br> Derivatively on Behalf of EBIX, INC., <br><br> Plaintiff, <br><br> vs. <br><br> ROBIN RAINA, HANS U. BENZ, ROLF HERTER, NEIL D. ECKERT, PAVAN BHALLA, HANS U. KELLER, GEORGE W. HEBARD III, AND STEVEN M. HAMIL, <br><br> Defendants, <br><br> – and – <br><br> EBIX, INC., a Delaware corporation, <br><br> Nominal Defendant | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

Civil Action No. 1:21-cv-04590-ELR

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY

<u>DEMAND FOR JURY TRIAL</u>

Plaintiff Daniel Lilienfeld ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant Ebix, Inc. ("Ebix" or the "Company") against certain current and/or former members of its Board of Directors (the "Board") and executive officers seeking to remedy the defendants' non-exculpable breaches of fiduciary duties and unjust enrichment beginning in approximately November 2020 and continuing to the present time (the "Relevant Period").

Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the pre-suit investigation conducted by and through his attorneys, which included, among other things, public statements made by the Company and the Individual Defendants (defined below), U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Ebix, news reports, securities analysts' reports, court filings in related civil lawsuits, advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further investigation and discovery.

## I.     INTRODUCTION

1.     This is a shareholder derivative action brought for the benefit of nominal defendant Ebix against certain current and/or former officers and directors based on their non-exculpable breaches of fiduciary duty and other serious misconduct as alleged in detail herein.

2.     Ebix supplies infrastructure exchanges to the insurance, financial, travel, cash remittances, and healthcare industries. Headquartered in Johns Creek, Georgia, Ebix's operations are overwhelmingly weighted in India, and its revenues and profits are primarily derived from the Company's India-based EbixCash subsidiary, particularly payment solutions such as prepaid cards and gift cards. EbixCash has recently developed into a driver of Ebix's revenue and profits. As of December 31, 2020, of Ebix's total 9,802 employees worldwide, 8,640 were located in India, and during that fiscal year (which ended December 31, 2020), approximately 91% of Ebix revenues came from EbixCash and Insurance Exchanges.

3.     During the third quarter of 2020, EbixCash experienced spectacular growth. Its revenues grew astronomically during that quarter, skyrocketing 268% compared to the third quarter of 2019. On a sequential basis, EbixCash's overall revenues grew a staggering 82% in the third quarter of 2020 over the second

quarter of 2020. The increase in 2020 total revenue compared to 2019 was due primarily to strong demand for Ebix's payment solutions offerings in India (primarily prepaid gift cards), which increased by more than $200 million year-over-year to approximately $256 million – a year-over-year increase of 590%. This increase reflected the strong demand for prepaid cards and other electronic payment solutions since the COVID-19 pandemic arose.

4.     On November 9, 2020, the Individual Defendants caused Ebix to file with the SEC its quarterly report for the period ended September 30, 2020 on Form 10-Q ("3Q20 10-Q"), which represented to stockholders that there were "no changes in our internal control over financial reporting during the quarter ended September 30, 2020 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting." In fact, there was a material weakness in Ebix's internal controls over financial reporting at this time. Specifically, Ebix's failure to design controls over the gift or prepaid card revenue transaction cycle sufficient to prevent or detect a material misstatement. The Company's independent auditor, RSM US LLP ("RSM"), would confirm this material weakness.

5.     A series of adverse circumstances led to this undisclosed material weakness. First, EbixCash's gift and prepaid card business was experiencing

astronomical growth. The COVID-19 pandemic was ravaging India, causing people to avoid traditional in-person payment solutions and instead opting en masse for the digital payment solutions offered by EbixCash, particularly gift and prepaid cards. Second, the pandemic also ravaged Ebix's workforce, most of which was working remotely, thus creating disruptions and inefficiencies. Third, recent regulations in India had facilitated widespread growth in the digital payment space, thereby fueling the skyrocketing growth for Ebix's gift and prepaid cards. Fourth, EbixCash redoubled it marketing efforts to concentrate on its gift and prepaid card products. Fifth, as digital payment solutions surged in popularity, concomitant digital fraud by "malicious" third parties [in Ebix's words] were on the rise and Ebix would be a prime target.

6.     This material weakness was publicly disclosed in a Form 8-K filed by Ebix with the SEC after the market closed on February 19, 2021. That filing revealed that Ebix's independent auditor, RSM, had taken the drastic step of resigning – ***before completing the 2020 audit*** – after it had repeatedly requested sufficient appropriate audit evidence that would allow it to evaluate the business purpose of significant unusual transactions that occurred in the fourth quarter of 2020 related to the Ebix's gift card business in India. Specifically, according to the February 19, 2021 8-K, RSM resigned "as a result of being unable, despite

repeated inquiries, to obtain sufficient appropriate audit evidence that would allow it to evaluate the business purpose of significant unusual transactions that occurred in the fourth quarter of 2020" related to the Company's gift card business in India. RSM also stated that there was a material weakness related to Ebix's failure to design controls "over the gift or prepaid card revenue transaction cycle sufficient to prevent or detect a material misstatement." In addition, Ebix and RSM disagreed over the accounting treatment of $30 million that had been transferred into a commingled trust account of Ebix's outside legal counsel in December 2020.

7.     Essentially, because Ebix failed to provide RSM with the audit evidence it requested, RSM had no choice but to resign and force Ebix to publicly disclose for the first time that there existed a material weakness in Ebix's internal control over financial reporting. Not only had the Individual Defendants concealed that fact from stockholders, but, as stated above, they affirmatively represented just the opposite: that there were "no changes in our internal control over financial reporting during the quarter ended September 30, 2020 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."

8.     Given the revelations of February 19, 2021, there can be no doubt that on November 9, 2020, at the time of the filing of the 3Q20 10-Q the Individual

Defendants knew or should have known that the Company lacked sufficient internal control over financial reporting. The astronomical growth experienced by EbixCash in the third quarter 2020, coupled with the other factors listed above which weakened internal control, had by that point revealed a material weakness in internal control over financial reporting – specifically, the Individual Defendants had failed to design controls "over the gift or prepaid card revenue transaction cycle sufficient to prevent or detect a material misstatement."

9.     The market reaction to Ebix's disclosures was swift and dramatic. The Company's share price fell $20.24 per share – losing approximately 40% of its value in a single trading day– to close at $30.50 on February 22, 2021, on unusually heavy trading volume of more than 11 million shares. (By comparison, trading volume on the prior trading day, February 19, 2021, was a mere 289,000 shares.)

10.     Importantly, public filings confirm that the Individual Defendants knew that RSM was not receiving the material audit evidence it had repeatedly requested. In a letter dated February 22, 2021, filed with the SEC on February 23, 2021, RSM stated that it communicated "clearly and unequivocally [to Ebix] that if the information repeatedly requested by RSM — but which was not provided by the Company— related to gift cards issued by ItzCash/EbixCash in the fourth

quarter of 2020 was further investigated, it might materially impact the fairness or reliability of the financial statements subject to RSM's audit or affect RSM's willingness to be associated with the Company's financial statements." Therefore, not only did the Individual Defendants repeatedly fail to provide RSM with information relating to the business purpose of the significant unusual transactions despite repeated requests from RSM, but the Individual Defendants knew from RSM's "clear" and "unequivocal" warning that the failure to provide the requested information was likely to cause RSM to take the serious step of resigning before its completion of the 2020 audit – an act which they knew would be devastating to the Company's credibility, its stock price and its stockholders.

11.    Nor could RSM's discovery of "significant unusual transactions" in the gift card business have been a surprise. The potential for fraudulent transactions in digital media, such as the gift and pre-paid card business in India, was well known to the Individual Defendants, as stated in the 2020 10-K:

> Malicious third parties are using increasingly sophisticated methods to engage in illegal activities such as identity theft, fraud and paper instrument counterfeiting. As we make more of our services available over the internet and other digital media, we subject ourselves to new types of consumer fraud risk due to more complex requirements relating to consumer authentication with internet services. Additionally, the COVID-19 pandemic has led to increased cyber and payment fraud risk, as cybercriminals attempt to profit from the disruption, given increased online banking, e-commerce and other online activity. We use a variety of tools to protect against fraud;

however, these tools may not always be successful. Allegations of fraud may result in fines, settlements, litigation expenses and reputational damage.

Our industry is under increasing scrutiny from federal, state and local regulators in the U.S. and regulatory agencies in many other countries in connection with the potential for consumer fraud. If consumer fraud levels involving our services were to rise, it could lead to further regulatory intervention and reputational and financial damage. This increased regulatory scrutiny, in turn, could lead to additional government enforcement actions and investigations, reduce the use, renewal and/or acceptance of our services or increase our compliance costs and, thereby, have a material adverse impact on our business, financial condition and results of operations.

12.     Further, the materiality of RSM's identification of a material weakness in internal control cannot be overstated, as each Individual Defendants was well aware. As explained in the Company's 2020 10-K:

If we fail to maintain an effective system of internal controls, we may not be able to accurately determine our financial results or prevent fraud. As a result, our stockholders could lose confidence in our financial results, which could harm our business and the market value of our common shares.

Effective internal controls over financial reporting are necessary for us to provide reliable and accurate financial reports and effectively prevent fraud. We may in the future discover areas of our internal controls that need improvement. Section 404 of the Sarbanes-Oxley Act of 2002 ("SOX") requires us to evaluate and report on the effectiveness of our internal controls over financial reporting and have our independent auditors issue their own opinion regarding the effectiveness of our internal control over financial reporting and related disclosures. While we continually undertake efforts to maintain an effective system of internal controls and compliance with SOX, we cannot always be certain that we will be successful in

maintaining adequate control over our financial reporting and related financial processes. Furthermore, as we grow our business, our internal control structure may become more complex, and could possibly require significantly more resources to ensure our internal controls remain effective. If we or our independent auditors discover a material weakness or significant deficiency in our controls over financial reporting, the disclosure of that fact, even if immediately remedied, could significantly reduce the market value of our common stock. In addition, the existence of any material weakness or significant deficiency may require management to devote significant time and incur significant expense to remediate any such weaknesses, and management may not be able to remediate the same in a timely manner.

13.     As a direct and proximate result of the Individual Defendants' misconduct, the Company has been damaged.

## II.     JURISDICTION AND VENUE

14.     This Court has jurisdiction over all claims under 28 U.S.C. § 1332(a) because there is complete diversity between the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

15.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

16.     This Court has personal jurisdiction over each defendant because each defendant is either a corporation conducting business and maintaining operations in this district or an individual who is either present in this district for jurisdictional purposes or has, directly and indirectly, used the means and instrumentalities of

interstate commerce, the United States mail, and the facilities of a national securities markets, such that each defendant has sufficient minimum contacts with this district so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because: (i) nominal defendant Ebix maintains its principal place of business in this district; (ii) one or more of the defendants resides or maintains offices in this district; (iii) a substantial portion of the transactions and wrongs complained of herein occurred in this district; and (iv) defendants have received substantial compensation in this district by doing business here and engaging in numerous activities that had an effect in this district.

### III.    THE PARTIES

#### A.    <u>Plaintiff</u>

18.     Plaintiff is a current holder of Ebix common stock and has continuously held Ebix common stock since 2013.  Plaintiff is a resident of the state of Illinois.

#### B.    <u>Nominal Defendant</u>

19.     Nominal Defendant Ebix is a Delaware corporation with its principal executive offices located at 1 Ebix Way, Johns Creek, Georgia 30097.

### C.    The Individual Defendants

20.    Defendant Robin Raina ("Raina") has served as Chief Executive Officer ("CEO") and President of the Company since 1999 and as Chairman of the Board since May 2002. Upon information and belief, defendant Raina is a citizen of Georgia.

21.    Defendant Steven M. Hamil ("Hamil") has served as Chief Financial Officer ("CFO") of the Company since April 2020. Upon information and belief, defendant Hamil is a citizen of Georgia.

22.    Defendant Hans U. Benz ("Benz") has served as a director of the Company since 2005. Defendant Benz is a member of the Audit Committee.  Upon information and belief, defendant Benz is a citizen of Germany.

23.    Defendant Rolf Herter ("Herter") has served as a director of the Company since 2005. Upon information and belief, defendant Herter is a citizen of Switzerland.

24.    Defendant Neil D. Eckert ("Eckert") has served as a director of the Company since 2005. Upon information and belief, defendant Eckert is a citizen of the United Kingdom.

25.    Defendant Pavan Bhalla ("Bhalla") has served as a director of the Company since 2004. Defendant Bhalla is Chair of the Audit Committee.  Upon

information and belief, defendant Bhalla is a citizen of Georgia.

26.     Defendant Hans Ueli Keller ("Keller") has served as a director of the Company since 2004. Defendant Keller is a member of the Audit Committee. Upon information and belief, defendant Keller is a citizen of Switzerland.

27.     Defendant George W. Hebard ("Hebard") has served as a director of the Company since 2015. Upon information and belief, defendant Hebard is a citizen of New York.

28.     As directors of the Company, defendants Raina, Benz, Herter, Eckert, Bhalla, Keller and Hebard are sometimes referred to herein as the "Board".

29.     Defendants Raina, Hamil, Benz, Herter, Eckert, Bhalla, Keller, and Hebard are sometimes referred to hereinafter as the "Individual Defendants."

30.     As members of the Audit Committee, defendants Benz, Bhalla, and Keller are sometimes referred to hereinafter as the "Audit Committee Defendants."

### IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS

31.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the

Company in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit.  Each director and officer owed to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

32.    The Individual Defendants, because of their positions of control and authority as directors and/or officers, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

33.    At all times relevant hereto, each of the Individual Defendants was the agent of the other Individual Defendants and of the Company and was at all times acting within the course and scope of such agency.

34.    To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the Individual Defendants were required to, among other things:

a.    manage, conduct, supervise and direct the business affairs of

the Company in accordance with all applicable laws;

b.      neither violate, nor knowingly permit any officer, director or employee of the Company to violate, applicable laws, rules and regulations;

c.      establish and maintain systematic and accurate records and reports of the business and affairs of the Company and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

d.      neither engage in self-dealing, nor knowingly permit any officer, director or employee of the Company to engage in self-dealing;

e.      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

f.      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

g.      ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times; and

h.      remain informed regarding how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

35.      Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and its shareholders the fiduciary duties of loyalty, good faith, the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants alleged herein involves a violation of their obligations as directors and/or officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining defendants.

36.      The Audit Committee Defendants owed specific duties to Ebix under the Audit Committee Charter ("Audit Charter"). According to the Audit Charter,

the Audit Committee's purpose is as follows:

> The Audit Committee (the "Committee") of the Board of Directors (the "Board") of Ebix, Inc. (the "Company") shall oversee the Company's accounting and financial reporting processes and the audits of the Company's financial statements, and shall otherwise exercise oversight responsibility, and assist the Board in fulfilling its oversight functions, with respect to matters involving the accounting, auditing, financial reporting and internal control functions of the Company. In so doing, it shall be the goal of the Committee to maintain free and open means of communication between the members of the Board, the Company's independent public accountants who audit the Company's financial statements (the "Auditors") and the Company's financial management. While it is not the Committee's responsibility to certify the Company's financial statements or to guarantee the Auditors' report, the Committee will facilitate discussions among the Board, the Auditors and the Company's management.

* * *

> ***The Committee plays a critical role in serving as a check and balance for the Company's financial reporting system. In carrying out its functions, the Committee's goal is to help ensure that management properly develops and adheres to a sound system of internal controls and that the Auditors, through their own review, objectively assess the Company's financial reporting practices***.

## V.    FACTS

### A.    Ebix's Background and Operations

37.    Founded in 1976 as Delphi Systems, Inc., Ebix provides on-demand software and e-commerce services to the insurance, financial, healthcare and e-learning industries. Although it has operations worldwide, Ebix's operations are overwhelmingly weighted in India and its revenues and profits are primarily

16

derived from its EbixCash subsidiary, whose operations are in India, particularly payments solutions such as prepaid cards and gift cards, as described in detail herein. International revenue accounted for 73.4% and 68.6% of Ebix's total revenue for the twelve months ended December 31, 2020 and 2019, respectively.

38.    EbixCash has become a primary driver of Ebix's revenue, profit and success. Ebix's 2020 10-K reported that "the increase in 2020 total revenue year-over-year was due primarily to strong demand for the Company's payment solutions offerings in India (primarily prepaid gift cards), which increased by more than $200 million year-over-year to approximately $256 million, or 590% year-over-year growth." As reported on the November 9, 2020 Third Quarter Investor Call, "EbixCash revenues grew 268% in third quarter of 2020 versus the third quarter of 2019. On a sequential basis, EbixCash overall revenues grew 82% in the third quarter of 2020 over second quarter of 2020." The 3Q20 10-Q reported that:

> total revenues increased year-over-year during the third fiscal quarter of 2020 due primarily to strong demand for the Company's payment solutions offerings in India…Revenues impacted by COVID-19 through September 30, 2020 were substantially offset by an approximately $98 million increase in payment solutions revenues, primarily in India. This substantial increase reflects the strong demand for prepaid cards and other electronic payment solutions since the COVID-19 pandemic arose.

39.    In May 2017, Ebix took a leadership position in the digital payments market in India by acquiring an 80% stake in ItzCash, the dominant payment

solutions exchange in India. The acquisition, which valued ItzCash (which became EbixCash) at $150 million, was touted as providing the Company with the opportunity to process financial, insurance, and healthcare transactions on an integrated Exchange. The press release announcing the acquisition on May 24, 2017, stated in relevant part:

> JOHNS CREEK, GA – May 24, 2017 – Ebix, Inc. (NASDAQ: EBIX), a leading international supplier of On-Demand software and E-commerce services to the insurance, financial, e-governance and healthcare industries, today announced that it has entered into a joint venture with India-based Essel Group, while acquiring an 80% stake in ItzCash, India's leading payment solutions Exchange. ItzCash is recognized as a leader in the prepaid cards and bill payments space in India, besides being the only profitable payments solutions provider out of all its peers, while having grown at a CAGR of 35% over the last 3 years.
>
> A leading driving force in the digitization of cash across India, ItzCash is a Financial Exchange for payment solutions that connects 75+ million consumers and 1,500+ corporate partners on its integrated payments solutions superhighway. With an Omni-channel strategy that encompasses a distribution network of 75,000+ physical retail outlets, the Company today is recognized as a leader in the prepaid cards and bill payments space. ItzCash processes approximately 600,000 transactions per day and approximately $2 Billion in annual payment volume, with an industry leading transaction success rate of 99%.
>
> *      *      *
>
> Key Strengths
>
> •      The Company is recognized as a leader in the Gift card space with brand gift cards across all categories with 100+ Brand copartners like Amazon, Flipkart.com, Croma, Lifestyle, Big Bazaar, Tanishq,

BookMyShow.com, Reliance Digital, MakeMyTrip.com, Café Coffee Day, Pizza Hut, Myntra.com, Pantaloon etc.

\*       \*       \*

"With the youngest tech-savvy society, the largest middle class, a 1.3 billion population, a country committed to going digital and a growth rate of 7% plus, India is an emerging economic superpower today. We are big believers in the power of exchanges and thus have been keen to take an early position in India in terms of powering financial and insurance exchanges," said Ebix Chairman, President and CEO Robin Raina. "In ItzCash, we found attributes that none of their peers had – market penetration across 3000 cities, 75,000+ brick & mortar distribution outlets, a CAGR of approximately 35% and the only company who was profitable amongst all its peers. With one of India's most prominent business houses, the Essel Group deciding to align their interests with Ebix, the decision to invest in ItzCash became easy for us."

Robin added, "We believe that the synergies between Ebix and ItzCash are at multiple levels and the ItzCash exchange when complemented with Ebix's portfolio of insurance & healthcare services along with our international scale, will set the foundations of a very powerful and scalable business opportunity."

40.     Described as employing a "Phygital" strategy that combines over 320,000 physical distribution outlets in India and many Associations of Southeast Asian Nations ("ASEAN") countries, to an online digital platform, the Company's EbixCash Financial exchange portfolio includes: domestic and international money remittance, foreign exchange (Forex), travel, prepaid and gift cards, utility payments, software solutions for lending and wealth management in India and other markets.

41.     Revenues from EbixCash are primarily derived from the sales of prepaid gift cards and consideration paid by customers for financial transaction services, including services like transferring or exchanging money. The significant majority of EbixCash revenue is for a single performance obligation and is recognized at a point in time. These revenues vary by transaction based upon channel, send and receive locations, the principal amount sent, whether the money transfer involves different send and receive currencies, and speed of service. EbixCash also offers several other services, including payment services and ticketing and travel services for which revenue is impacted by varying factors. EbixCash acts as the principal in most transactions and reports revenue on a gross basis, as EbixCash controls the service at all times prior to transfer to the customer, is primarily responsible for fulfilling the customer contracts, has the risk of loss, and has the ability to establish transaction prices. The main services from which EbixCash derives revenue are gift cards and prepaid cards, travel exchanges, money transfers, Forex and remittance services, and technology services.

42.     Among its operations, EbixCash sells general purpose prepaid gift cards, that can be later redeemed at various merchants, to corporate customers and consumers. The gift cards are co-branded between EbixCash and its card-issuing banking partner(s) and are affiliated with major payment associations such as

VISA, Mastercard, and Rupay. The gift cards are sold to a diversified set of corporate customers from various industries. The gift cards are used by corporate customers to disburse incentives to the end users, which are primarily their employees, agents and business associates. The gift cards sold by EbixCash are not reloadable, cannot be used at ATMs or for any other cash-out or funds transfer transactions, and are subject to maximum limits per card (currently INR10,000 or approximately $140, depending on the exchange rate). Gift cards issued by EbixCash are valid for a period of 15 months from the date of issuance for virtual cards and three years for physical cards. EbixCash has entered into arrangements with banks and financial institutions to settle payments to merchants based on utilization of the gift cards.

43.     Ebix has end-to-end responsibilities related to the gift cards sold, from the activation and ongoing utilization of the gift cards to customer service responsibilities to risk of loss due to fraud on the gift cards sold. EbixCash acts a principal in the sale of gift cards and, thus, gift card revenue is recognized on a gross basis (full purchase value at the time of sale) with the corresponding cost of the gift cards recorded as cost of services provided. Unredeemed gift cards at December 31, 2020 were not significant to Ebix's financial results and were recorded as deferred revenues in the financial results.

44.     Ebix reported the substantial revenue growth in payment solutions in

Management's Discussion and Analysis of Financial Condition and Results of

Operations ("MD&A") in the 3Q20 10-Q, which stated in relevant part:

> While our travel, foreign exchange and remittance businesses
> continue to be materially negatively impacted by COVID-19, total
> revenues increased year-over-year during the third fiscal quarter of
> 2020 due primarily to strong demand for the Company's payment
> solutions offerings in India.

*       *       *

> For the nine months ended September 30, 2020 the Company's travel,
> foreign exchange and remittance business revenues declined by over
> $100 million year- over-year, a decrease of greater than 60%.
> Revenues impacted by COVID-19 through September 30, 2020
> revenues were substantially offset by an approximately $98 million
> increase in payment solutions revenues, primarily in India. This
> substantial increase reflects the strong demand for prepaid cards and
> other electronic payment solutions since the COVID-19 pandemic
> arose.

45.     The Ebix Third Quarter 2020 Investor Call took place on November 9,

2020. Defendants Raina and Hamil participated, among others. Defendant Raina

explained during the call that the EbixCash revenue growth enhanced the lucrative

prospects of the planned initial public offering ("IPO") of Ebix Cash:

> EbixCash revenues grew 268% in third quarter of 2020 versus the
> third quarter of 2019. On a sequential basis, EbixCash overall
> revenues grew 82% in the third quarter of 2020 over second quarter of
> 2020. Remittance revenues grew 46% sequentially, while foreign
> exchange revenues grew 113% sequentially. Travel revenues grew
> 346% sequentially, while our technology- based India revenues grew

8% sequentially in third quarter of 2020. I expect EbixCash revenues to continue to grow in coming quarters with the gradual improvement in the travel, foreign exchange and e-Learning areas besides the organic growth in our other business areas. We are, for example, presently pursuing some large opportunities in the bus exchange arena that are highly recurring and income-intensive. We are presently trying to draw a balance between our efforts to grow our EbixCash margins and our attempts to be a leader in the financial markets. EbixCash performance is particularly noteworthy when you compare it to its key competitors with high valuations who collectively lost $1 billion last year in the Indian market and delivered much less top line growth than EbixCash.

\*       \*       \*

With regards to the IPO, we are keeping our fingers crossed as we look at the overall IPO climate improve in India. We already have 3 top investment banks on our site with a fourth investment bank to be added to the investment banking team. We already have the legal firms hired, along with a Big Three firm for subject matter analysis work that goes into our IPO documents. The IPO effort is a very involved process that entails hiring of 3 to 4 set of legal firms, multiple subject matter, analyst firms, a credit rating firm, IR and PR firm, auditors to approve all numbers being filed across 3 years for all subsidiaries, et cetera. We think that it is prudent to let the COVID-19 crisis blow over and let the markets normalize before we launch our IPO. Accordingly, we intend to work closely with all our investment bankers through this period, and keep parcels in a ready-mode for the IPO, while we wait for this pandemic to pass. We're keeping a close watch on the improving financial markets in India. The recent IPOs in India have been heavily oversubscribed, and there seems to be a pent-up demand for solid IPOs. There are a number of big IPOs planned next year.

And we hope that we will be one of them. We will keep you informed about that.

We see the IPO as a possible multibagger opportunity for the shareholders of Ebix, as all other financial exchange sector companies

in India with billions of dollars in valuation do not have the strong financial metrics that our operation in India has. If anything, the COVID-19 period has further shown the strength of our business model.

46.   During the call, Jeffrey Lee Van Rhee, Partner & Senior Research Analyst, Craig- Hallum Capital Group LLC, Research Division, asked the following questions about the importance and potential of the payments business and Defendant Raina answered as follows:

JEFFREY LEE VAN RHEE: Okay. Okay. And then secondly, I guess, Robin, as it relates to the payments business, the payments card for the digital payment solutions side is seeing very strong demand. Can you help put some -- a little more clarity around that. What was it in Q2? What was it in Q3? Kind of what's the trajectory in Q4? It sounds like you've seen strength there. And I think you made a comment in the script that you -- since that strength will continue, it will be a bigger part of the business. Obviously, it has substantial negative impacts on the gross margin side, but I'm sure has some uplift on the EBITDA dollar side.

So just talk about that business, if you can quantify it and then the thinking around why it's surging and whether or not you want to continue to lean into that revenue stream?

ROBIN RAINA: Well, Jeff, first of all, I mean, look at our competition. Meaning I have worthy competitors out there who only do payment solutions, are presently -- and are presently getting valued in -- up between $10 billion and $20 billion with way lesser revenues, $450 million, $400 million of revenue and $600 million, $700 million of lost sales. So clearly, market seems to still like the payments business. So having said that, from our perspective, being in payment business is very important because it makes us completely -- it spreads our reach virtually across the country. It is -- this is amazing marketing for us. Besides -- I -take the point of lower gross margin.

There's no question about it. At the same time, this takes us everywhere across the world it allow -- it across the country. It allows us to cross-sell so many of our remaining products. So when you consider all of that, when you put that into the mix, we think that's a good position to be in to continually -- there are high-margin areas and then there are lower margin areas. So if your lower-margin areas allow you to sell more of your high-margin areas then you should continue with the lower margin area as long as you're not losing money on any one of those.

 And having said that, we expect the payments businesses to continue to improve. Part of it is what COVID has done, it has created a new thinking pattern where people now are -- especially in the payments business, people don't want to touch an ATM machine now. People -- you're going to see more and more of these ATM machines go out of play. So people are wanting to do touchless systems. People are trying to buy more stuff online right now, maybe now it's not going to change entire India overnight simply because India has a pretty good lower middle class and a very strong lower -- and has a very strong middle class. So having said that, and a lot of them are illiterate. So it's not that easy to make everybody digital overnight. At the same time, there is a continuous move in that direction right now. And if you see some of the larger players that have entered the market, what has happened is, if you see the -- right now, for example, Google Pay has become the largest player in the market with more than -- between PhonePe and Google Pay, they now have close to 70% of the market. And then you have players like Paytm come in with much smaller market share because it's become a very important area of the business.

So everybody feels -- the reason they want to play into this business area because this may take them everywhere. And then they will obviously cross- sell all their remaining products. So for obvious reasons, when we do our payment services, we're also able to market our remaining product because everything is connected, right? Where we become the brand who -- the only player who cannot only do payment solutions, but incidentally, we can handle -- we can conduct their ForEx, their travel, you want to buy your bus tickets or whatever

you want to do, we are virtually there with all those different tool sets. And incidentally, for all of those, they still need to use that -- some kind of a card or something out there. So we feel it's a complete -- it meshes in really well with our overall strategy.

47.    The Ebix 2020 10-K explained the reasons for the astronomical revenue growth for Ebix's payment solutions in India during 2020, primarily prepaid gift cards. According to the 2020 10-K:

the increase in 2020 total revenue year-over-year was due primarily to strong demand for the Company's payment solutions offerings in India (primarily prepaid gift cards), which increased by more than $200 million year-over-year to approximately $256 million, or 590% year-over-year growth. The increased demand for prepaid gift cards in India was primarily due to: (i) changes in regulations by the Reserve Bank of India related to debit cards, which has shifted demand in the market towards prepaid gift cards; (ii) COVID-19, which has facilitated increased online and electronic commerce due to restrictive lockdowns in 2020; and (iii) the Company's increased marketing efforts around the prepaid gift card business.

48.    During the April 27, 2021 Investor Call in which both defendants Raina and Hamil participated, defendant Hamil further described the sequential growth in payment solutions of 96% from 3Q20 to 4Q20 and the reasons for such growth:

The payment solutions business increased 96% sequentially in the fourth quarter from Q3 2020 and for the fiscal year experienced year-over-year growth of approximately 590%. This growth was fueled by several factors. First, the Government of India has made the digitization and electronification of the Indian economy a priority in recent years. Second, actions taken in 2019 by the regulatory authorities in India resulted in prepaid gift cards being an attractive

product for customers relative to traditional debit card options. Third, COVID-19 and the lockdowns that resulted from the pandemic increased the demand for our prepaid gift cards. And lastly, Ebix consciously targeted this product with increased marketing efforts to address market demand and increase our own EbixCash brand awareness through the co-branded gift cards between EbixCash and our bank partner.

### B.   EbixCash Spinoff

49.   Beginning in 2018, the Individual Defendants advised stockholders that they intended to spin off EbixCash in an IPO, which the Individual Defendants knew could be highly lucrative both for the Company and for themselves personally. For instance, Inc42, a news service focused on India-based technology startups, published an article on August 15, 2018 titled "With An Eye On IPO In India For 2019, Ebix May Invest $500 Mn More In Acquisitions." The article reported that "with plans to make EbixCash, the Indian subsidiary of Ebix Inc, public next year, the parent company has continued to double down on its aggressive acquisition strategy in India." The article quoted defendant Raina as saying that Ebix was planning the IPO for some time in 2019.

50.   On June 18, 2019, in a press release titled "Ebix Commences EbixCash IPO Process while Targeting a Q2 2020 IPO," the Individual Defendants announced that the Company was moving forward with the planned IPO of EbixCash and was intending to proceed in the second quarter of 2020:

JOHNS CREEK, Ga., June 18, 2019 (GLOBE NEWSWIRE) -- Ebix, Inc.

(NASDAQ: EBIX), a leading international supplier of On-Demand software and E-commerce services to the insurance, financial, healthcare and e-learning industries announced that its Board of Directors has approved the process of appointment of up to five investment bankers, with an initial public offering (IPO) targeted timeline of Q2 2020 for its EbixCash operations headquartered in India.

The Company announced that is in advanced stages of selection of investment bankers, towards launching the EbixCash IPO on the Indian stock exchanges. The details of the IPO in terms of the targeted money raise and the bankers who would lead this exercise will be announced in due course.

With a "Phygital" strategy that combines 320,000 physical distribution outlets in many Southeast Asian Nations ("ASEAN") countries, to an Omni-channel online digital platform, the Company's EbixCash Financial exchange portfolio encompasses leadership in areas of domestic & international money remittance, foreign exchange (Forex), travel, pre-paid & gift cards, utility payments, lending, wealth management etc. in India and other markets.

EbixCash's Forex operations have emerged as a leader in India's airport Foreign Exchange business with operations in 32 international airports including Delhi, Mumbai, Bangalore, Hyderabad, Chennai and Kolkata, conducting over $4.8 billion in gross transaction value per year.

EbixCash's inward remittance business in India conducts approx. $5 billion gross annual remittance business, confirming its undisputed leadership position in India. EbixCash, through its travel portfolio of Via and Mercury, is also one of Southeast Asia's leading travel exchanges with over 2,200+ employees, 212,450+ agent network, 25 branches and over 9,800 corporate clients; processing an estimated $2.5 billion in gross merchandise value per year.

EbixCash's technology services Division has emerged as a leader in the areas of lending technology, asset & wealth management technology, travel technology in India; besides having grown its international expanse to Europe, Middle East, Africa and ASEAN countries.

EbixCash's investments in targeted asset-lite technology startups like Routier and AHA taxis have positioned it as a key player in niche sectors like trucking logistics and intercity corporate and consumer cab travel respectively.

51.    On January 6, 2020, the Individual Defendants provided stockholders

with an update on the planned IPO of EbixCash. In a press release titled "EbixCash

Announces IPO Update," the Individual Defendants stated, in pertinent part:

NOIDA, INDIA & JOHNS CREEK, GA – January 6, 2020 – EbixCash, a fully owned subsidiary of Ebix, Inc. (NASDAQ: EBIX), a leading international supplier of On-Demand software and E-commerce services to the insurance, financial, healthcare and e-learning industries today announced an update on its EbixCash IPO plans in India.

EbixCash announced that it is continuing to make progress in terms of moving forward with its IPO plans. The Company declared today the appointment of two domestic legal counsel and one international legal counsel, to handle its IPO.

The Company also said that it will soon announce the appointment of a reputed international industry analyst firm towards analyzing the industry and EbixCash's relative position in the markets with respect to the industry. All of this detailed analysis would form an integral part of the EbixCash Draft Red Herring Prospectus (DRHP) – the offer document to be filed by the company for its public IPO.

The Company declared that it is also evaluating a number of international investment bankers, with a view to appoint one or two international investment bankers, as the Company deems fit. The

Company intends to formalize the appointment/s soon, with a view to finalize its investment banking roster.

On 4th September 2019, the Company announced the appointment of ICICI Securities as the Left Banker, besides being one of the Book Running Lead Managers for the IPO. The Company also announced the appointment of Axis Capital and Edelweiss Financial Services as Book Running Lead Managers on the same date.

52.    On March 2, 2020, *Seeking Alpha* published an article titled "Ebixcash IPO, BSE [Bombay Stock Exchange] Deal Make Ebix a Buy at its 4-Year Low." Among other things, the article opined on the potential value of the EbixCash IPO by comparing it to other recent spinoffs based on EbixCash's past and expected performance:

In the past few years, Ebix has been focused mostly in the Indian market. It has successfully penetrated the industry through a number of acquisitions. In 2018, the company acquired 13 companies in the country. Last year, it spent more than $337 million to acquire Yatra. Yatra is now part of Ebixcash making it the second-biggest online travel company after MakeMyTrip (MMYT), which is valued at more than $2.65 billion. China's CTrip owns 49% of the company.

Ebixcash has other cash-related offerings ranging from hotels, trucks, mobile money, currencies and bill payments. Today, Ebixcash is the biggest division for Ebix. In the most recent quarter, the division made more than $82 million.

In the earnings call, the management said that the IPO process was ongoing. The likely valuation is not yet known. However, a close look at the Indian industry can give a picture of what to expect. For example, MakeMyTrip is valued at more than $2.65 billion, while growing at 13%. Meanwhile, Ebixcash made $82 million, has better margins, and has a faster growth rate. In the last quarter, without acquisitions, Ebixcash grew by 23%.

Also, the company expects Ebixcash to make between $500 million and $600 million in the coming year. Therefore, at minimum, I expect the company to receive a valuation of more than $1.5 billion. In the earnings call, the company talked about a company that received a valuation of $1.5 billion even with its annual revenue of $1.5 billion.

Ebixcash has some significant challenges ahead. The biggest challenge is competition, with all its sub-sectors facing significant competition. For example, its forex service is facing challenges from the likes of Transferwise and Google Pay while its taxi business facing competition from the likes of Uber (UBER) and Ola. Still, the company has something that other companies in the cash industry don't have. It has a physical presence throughout the country. This is advantageous since 70% of the Indian population stays in the rural areas. Therefore, we expect the IPO to be positive for the company's shareholders, who will likely receive a special dividend. It will also be positive for the company because it will help it do some deleveraging.

53.     During the November 9, 2020 third quarter investor call, defendant

Raina stated regarding the IPO:

With regards to the IPO, we are keeping our fingers crossed as we look at the overall IPO climate improve in India. We already have 3 top investment banks on our site with a fourth investment bank to be added to the investment banking team. We already have the legal firms hired, along with a Big Three firm for subject matter analysis work that goes into our IPO documents. The IPO effort is a very involved process that entails hiring of 3 to 4 set of legal firms, multiple subject matter, analyst firms, a credit rating firm, IR and PR firm, auditors to approve all numbers being filed across 3 years for all subsidiaries, et cetera. We think that it is prudent to let the COVID-19 crisis blow over and let the markets normalize before we launch our IPO. Accordingly, we intend to work closely with all our investment bankers through this period, and keep parcels in a ready-mode for the IPO, while we wait for this pandemic to pass. We're keeping a close watch on the improving financial markets in India. The recent IPOs in India have been heavily oversubscribed, and there seems to be a pent-

up demand for solid IPOs. There are a number of big IPOs planned next year. And we hope that we will be one of them. We will keep you informed about that.

We see the IPO as a possible multibagger opportunity for the shareholders of Ebix, as all other financial exchange sector companies in India with billions of dollars in valuation do not have the strong financial metrics that our operation in India has. If anything, the COVID-19 period has further shown the strength of our business model.

54.   On April 16, 2021, the Individual Defendants caused the Company to issue a press release updating stockholders on the EbixCash IPO. The release announced that the Company's India-based subsidiary had decided to commence work on the IPO following a meeting with four investment banks, including ICICI Securities, Axis Capital, SBI Capital, and Edelweiss Financial Services. Those four financial institutions were expected to be the lead managers of the proposed IPO. In pertinent part, the April 16, 2021 press release stated:

NOIDA, India and JOHNS CREEK, Ga., April 16, 2021 (GLOBE NEWSWIRE) -

- Ebix, Inc. (NASDAQ: EBIX), a leading international supplier of On-Demand software and E-commerce services to the insurance, financial, healthcare and e- learning industries today announced that its EbixCash Indian subsidiary has decided to commence work with immediate effect, leading to the proposed IPO of EbixCash. The Company made that decision after a meeting of all the four investment bankers with the Company a few days back. ICICI Securities, Axis Capital, SBI Capital & Edelweiss Financial Services are Lead Managers to the proposed EbixCash IPO.

Accordingly, the Company has decided to engage two statutory

auditors in a dual auditor role (a named national auditor and a named international auditor) for the IPO, to commence the 3-year audit exercise leading to filing of the draft red herring prospectus (DRHP), with the Securities and Exchange Board of India. DHRP is the preliminary registration document prepared by the investment bankers for the prospective IPO. The Company is targeting the filing of the DHRP by the fourth quarter of 2021 with a targeted IPO in the first quarter of 2022.

EbixCash also announced earlier that it has already engaged the domestic and international legal firms for this exercise. The Company has also selected a BIG4 accounting firm for the market and product analysis sections of the DHRP. Over the next few months, the Company will be engaging a few other firms for various elements of the DHRP.

A few weeks back, the Company had announced the addition of SBI Capital Markets as the fourth Lead Manager for the EbixCash IPO, besides ICICI Securities, Axis Capital & Edelweiss Financial Services who were appointed Book Running Lead Managers for the IPO earlier. ICICI Securities serves as the Left Banker for the IPO.

55.    The performance incentives embedded in the Individual Defendants' compensation render them poised to benefit tremendously from the IPO of EbixCash. For instance, defendant Raina's Bonus Plan, approved by Ebix's shareholders in 2016, provides for the payment of annual cash incentive awards reflective of certain performance goals. The Bonus Plan provides that Raina is eligible to receive cash incentives in connection with a particular fiscal year during the term of the Bonus Plan if the Company meets or exceeds certain performance goals set each year by the Compensation Committee. Accordingly, defendant

Raina had every motivation to complete the EbixCash IPO, and to enhance the perceived value of EbixCash – and indeed Ebix itself – so as to complete the EbixCash IPO at the highest possible price and benefit financially from an IPO as a more than 14% shareholder of Ebix.

### C.   Public Reporting Regarding Ebix's History of Suspicious Accounting Practices

56.   Since at least 2018, the financial media has been voicing concerns over Ebix's accounting and senior management's lack of transparency with stockholders. For instance, between December 2018 and July 2019, Fraser Perring ("Perring") of Viceroy Research ("Viceroy") published no less than seven reports regarding Ebix. On December 11, 2018, in a report titled "Ebix – Goodwill Hunting," Viceroy reported on "accounting irregularities, undisclosed tax investigations, auditor shuffling" and "accounting irregularities dating as far back as 2008 to the present day." Among the issues pointed out in this article were the improper recording of revenue and the engagement of an auditing firm too inexperienced to expose the discrepancies:

> •   Numerous accounting discrepancies in years 2013 to 2018 regarding the recognition of goodwill and acquisitions within the Ebix group. These discrepancies have largely gone unnoticed due to the delay in local filings being signed off and the multi-jurisdictional nature of these transactions.
>
> •   Over the course of our investigation we uncovered evidence

of what we believe is a scheme to incorrectly book revenue and earnings. We believe this is done through the shuffling of assets from one subsidiary to another while improperly booking internal revenues, and contingent consideration "cookie jar" accounting.

• We are limited by the recency of the available subsidiary filings. We believe this behavior continues to take place. Ebix's acquisition spree in India further muddies the waters.

• Ebix announced a change in auditor to T.R. Chadha from Cherry Bekaert (of MiMedx fame) after reporting material weaknesses regarding purchase and income tax accounting, pursuant to appointing a big four accounting firm in Q1 2019.

• T.R. Chadha has never audited a US-listed entity and was auditor of several Indian Ebix subsidiaries in which there appear to be several accounting discrepancies.

57. Two days later, on December 13, 2018, Viceroy published another piece on Ebix, this one titled "Ebix – The Taxman Cometh," which reported that Indian tax authorities had searched Ebix's Mumbai offices. That report noted that although Defendant Raina asserted that Ebix has "never been on the wrong side of any regulatory or tax authority," the Company had, in fact, settled a dispute with the IRS for approximately $20 million, was the target of a "prolonged" SEC investigation, and was the subject of a "possible ongoing DOJ investigation."

58. The December 13, 2018 Viceroy report stated that, "contrary to Raina's claims, it appears his conduct was subject to regulatory scrutiny even prior to his rise to CEO. Ebix's former auditor, Arthur Anderson, was charged by the SEC for improper conduct and fraud relating to the audit of Ebix's revenue

recognition practices at a time where Raina was VP of Sales and Marketing and COO."

59.    Yet another Viceroy report, published on January 7, 2019, shone a light on a "major red flag" at Ebix and management's tendency to mislead stockholders regarding contracts. The report, titled "Ebix – Ebix's 2019 'Not-So-Good Business Acumen' Nomination," stated as follows:

> Ebix Inc (NASDAQ: EBIX) have come out with multiple acquisitions and service "deals" since our multiple publications on the Company. On further investigation, we found that one of Ebix's announced contracts had not yet been finalized. Ebix retracted its press release about a Dubai Forex Services contract: investors were misled on the status of the contract.
>
> This is a major red flag, and exaggerates what we believe is an already extremely high risk investment strategy at Ebix.
>
> Investors will note that Ebix have avoided commenting on the audit committee's recommendation for Ebix to retain the services of Top 4 Auditor for regulatory reasons. We can only assume the Top 4 preferred to give ad hoc accountancy advice rather than full audit responsibilities.

60.    On March 19, 2019, Viceroy submitted a request to the SEC, pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for all consumer complaints made against Ebix. The SEC's response was telling: in a letter to Viceroy on June 20, 2019, the SEC refused to turn over certain information relating to whistleblowers, enforcement activity, and confidential sources working

with law enforcement – thus implicitly acknowledging the existence of such activity.

61.     On January 15, 2019, in an article titled "Stock Sale Came Days Before Announcement Sent Ebix Shares Plummeting," *The Atlanta Journal-Constitution* reported that Ebix's controlling shareholder with ties to the Board sold a sizable block of shares just before the Company announced a change in auditor, which, according to legal experts, "rais[ed] questions of insider trading." In reporting on an auditor shakeup at the Company – which would become a familiar occurrence at Ebix – the article stated:

> Rennes Foundation, an entity based in Liechtenstein with a controlling interest in Ebix, sold 12,800 shares on Oct. 3. Rennes' lead director, Zurich attorney Rolf Herter, sits on Ebix's board of directors.

> Two days later, on a Friday, the company announced it was changing auditors, from Virginia-based Cherry Bekaert to an Indian firm, T R Chadha & Co. According to a federally required Form 8-K filed with the U.S. Securities and Exchange Commission, the decision was "necessitated by the company's revenue and asset concentration in India for the year 2018."

62.     The article also noted that Ebix has recently been the target of investigations by the SEC, U.S. Department of Justice ("DOJ"), and the U.S. Internal Revenue Service ("IRS").

63.     In August 2019, Perring tweeted an excerpt from an article published by the *Economic Times* showing that defendant Raina had misled stockholders

about the status of a purported contract between Ebix and Dubai International Airport. According to Perring, defendant Raina was "caught lying" when he claimed in November 2018 that EbixCash had secured a contract with the Dubai airport. The existence of the contract could not be verified until more than eight months later when, on July 18, 2019, an airport spokesperson confirmed the agreement with EbixCash.

64.     Financial analyst Praveen Chawla, in an article published on financial news service GuruFocus.com on June 7, 2021, observed a "[l]ack of transparency in segment reporting" within Ebix. According to Chawla, "A big issue I noticed is that in spite of Ebix conducting multiple unrelated businesses, it reports as a single segment. This is odd as it is not clear why it does so. This makes it very hard for investors to analyze and value a business within the corporate umbrella. Everything is lumped together. Since the company continually and aggressively makes tuck-in acquisitions, it becomes very difficult to ascertain if these acquisitions are adding or detracting from the bottom line."

65.     The article continued: "Ebix has spent $812 million between 2008 and 2020 acquiring new businesses. Meanwhile, net income went from around $27 million to $89 million in that period (cumulative income of $946 million in the 2008 to 2020 period). This does not appear to be an impressive return on

investment. Return on invested capital has been declining continuously for the last 15 years."

66.    In 2020, online travel company Yatra Online, Inc. ("Yatra") sued Ebix, among other parties, in the Delaware Court of Chancery for fraud, breach of the covenant of good faith and fair dealing, breach of contract, and tortious interference with contract in connection with a planned merger between Yatra and Ebix. *Yatra Online, Inc. v. Ebix, Inc., et al.*, Case No. 2020-0444-JRS (Del. Ch.) (the "*Yatra* Action"). The *Yatra* Action accuses Ebix of withholding material information while the parties negotiated the terms of a merger and alleges that Ebix lied about the fact that its accounting practices were the subject of investigations by the SEC and other regulators. Motions to dismiss in the *Yatra* Action remain pending as of the filing of this Action.

### D.    RSM's Engagement and Resignation

67.    RSM was engaged on June 12, 2020 to serve as Ebix's independent auditor for the year-ended December 31, 2020, and it performed audit services in connection with that audit until its resignation on February 15, 2021.

68.    According to Ebix's Form 8-K dated February 19, 2021 and RSM's letter dated February 22, 2021, filed with the SEC on February 23, 2021, when conducting the 2020 audit of Ebix, RSM identified certain significant unusual

transactions during the fourth quarter of 2020 related to Ebix's gift card business in India.

69.    Ebix stated in its February 19, 2021 8-K that RSM resigned "…as a result of being unable, despite repeated inquiries, to obtain sufficient appropriate audit evidence that would allow it to evaluate the business purpose of significant unusual transactions that occurred in the fourth quarter of 2020, including whether such transactions have been properly accounted for and disclosed in the financial statements subject to the Audit." RSM stated in its letter filed by Ebix with the SEC on February 23, 2021 that it communicated:

> clearly and unequivocally [to Ebix] that if the information repeatedly requested by RSM — but which was not provided by the Company — related to gift cards issued by ItzCash/EbixCash in the fourth quarter of 2020 was further investigated, it might materially impact the fairness or reliability of the financial statements subject to RSM's audit or affect RSM's willingness to be associated with the Company's financial statements.

70.    In addition, in its resignation letter dated February 15, 2021, RSM stated that it failed to obtain sufficient appropriate audit evidence that would allow it to evaluate the business purpose of significant unusual transactions that occurred in the fourth quarter of 2020. In short, RSM resigned because Ebix failed to provide or could not provide (because it did not exist) audit evidence that was both "sufficient" and "appropriate" that would enable RSM to independently evaluate

the business purpose of each identified significant unusual transaction.

71.     As described herein, RSM could not, despite repeated inquiries, obtain from Ebix sufficient audit evidence relating to the business purpose of the significant unusual transactions that occurred in the fourth quarter of 2020, and was not sufficiently comfortable with the quantity, nor the relevance and reliability of the audit evidence provided by Ebix concerning these transactions in order to issue a clean (i.e., unqualified) opinion on the financial statements subject to the year-end December 31, 2020 audit.

72.     The Individual Defendants, including in particular the Audit Committee Defendants, and Ebix management knew or recklessly disregarded the existence of the significant unusual transactions at issue and the weakness of internal control over financial reporting because RSM made "repeated inquiries, to obtain sufficient appropriate audit evidence…to evaluate the business purpose of [the] significant unusual transactions…" in EbixCash, Ebix's core business and primary driver of revenue and profit.

73.     RSM's letter dated February 22, 2021, filed with the SEC on February 23, 2021, makes it abundantly clear that RSM repeatedly attempted to obtain information from Ebix related to the significant unusual transactions and was continually rebuffed – to the point where RSM determined it had no other

alternative but to take the extraordinary action of resigning as Ebix's independent auditor before it completed the audit, thus abandoning a lucrative contract with a large public company.

74.     Furthermore, not only did the Individual Defendants know and fail to disclose that RSM had uncovered "significant unusual transactions" for which there was insufficient appropriate audit evidence, as well as a material weakness in internal control over financial reporting, but the Individual Defendants also knew and failed to disclose that Ebix was either unwilling or unable to provide RSM with sufficient and appropriate audit evidence to explain and support the significant unusual transactions. The Individual Defendants also knew or recklessly disregarded that Ebix's failure to furnish the requested information to RSM created a serious risk that RSM would resign as auditor, thus creating a severe negative impact on Ebix and its stock price and material losses to the Company and stockholders.

75.     Because Ebix (at the Individual Defendants' direction) did not provide (or could not provide) sufficient appropriate audit evidence that would permit RSM to evaluate the business purpose of the significant unusual transactions, RSM could not comply with the Public Company Accounting Oversight Board's ("PCAOB") basic auditing standards relating to these transactions, which required RSM to

obtain sufficient competent evidential matter in support of such transactions and evaluate the business purpose of each transaction. RSM could not ascertain whether the transactions had been properly accounted for and disclosed in Ebix's financial statements, thus causing it to take the serious step of resigning before the audit was completed.

76.     Pursuant to PCAOB AS 1301.12 and 1301.13(d), RSM had an obligation to communicate to the Board's Audit Committee information related to the significant unusual transactions identified by RSM, and to communicate the business purpose or lack thereof. The Audit Committee Defendants (Benz, Bhalla and Keller) were responsible for communicating such matters to the Board, including its Chairman, defendant Raina, and Ebix's financial management, including defendant Hamil, Ebix's CFO. Accordingly, the Individual Defendants -- and especially the Audit Committee Defendants -- knew or recklessly disregarded the existence of significant unusual transactions and RSM's inability to obtain sufficient appropriate audit evidence relating to the significant unusual transactions at issue.

77.     The weakness in internal control which caused RSM to resign was material. RSM resigned because, among other things, Ebix's internal control over financial reporting was "ineffective." According to the February 19, 2021 8-K,

there was a failure to "design or implement the necessary procedures and controls over the gift or prepaid card revenue transaction cycle sufficient to prevent or detect a material misstatement" in Ebix's financial statements subject to the year ended December 31, 2020 audit.

78.   Under PCAOB standards, in order to determine a material weakness, RSM determined: (1) that the deficiency in Ebix's internal accounting controls relating to the gift or prepaid card revenue transaction cycle were "severe"; (2) that there was a reasonable possibility that Ebix's annual or interim financial statements could contain a material misstatement; (3) that there was no reasonable assurance that the gift and prepaid card revenues in India were necessarily recorded to ensure compliance with U.S. Generally Accepted Accounting Principles ("GAAP"); and (4) that Ebix failed to maintain the necessary procedures and controls over its gift or prepaid card revenue transaction cycle sufficient to prevent or detect a material misstatement in the financial statements subject to the audit – all of which amounted to a material weakness in Ebix's internal accounting controls.

79.   The material weakness in internal control over Ebix's financial reporting, which was confirmed and publicly identified by RSM, were known to or recklessly disregarded by the Individual Defendants during the Relevant Period, when they permitted the Company's SEC filings, including the 3Q20 10-Q, to state

that there were no "changes in our internal control over financial reporting during the quarter ended September 30, 2020 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."

80.    Accounting literature provides that an auditor should consider withdrawing from an audit in the following circumstances: (1) when the client limits the scope of an audit and does not permit the auditor to access all of the components of the business due to the possibility of a qualified or unclean audit opinion; (2) the identification of fraudulent activity by a client that jeopardizes the integrity of the engagement; (3) the audit client lacks integrity, is dishonest, and/or misstates audit evidence; and (4) the auditor losses independence during the audit due to a conflict of interest and/or intimidation, and the integrity of the audit is compromised rendering it unreliable. Moreover, it is well-accepted that auditing firms should avoid withdrawing from an audit unless absolutely necessary for the firm to maintain the integrity of its deliverables, business, and the larger auditing profession.

81.    An auditor resignation from an engagement shortly before the completion of an audit is a rare and extraordinary event. Doing so suggests that the client is associated with greater risk, one with which the auditor does not wish to be associated.

82.    In particular, large, sophisticated, well-staffed auditors, like RSM, have both the incentives and the ability to detect hidden risks and when they detect that risks are sufficiently high, they resign from the engagement. Resignations by such auditing firms signal that engagements have high litigation risk, high audit risk, and/or high business risk.

83.    RSM's evaluation of the significant unusual transactions with no apparent business purpose, for which Ebix did not, despite repeated requests, provide sufficient appropriate audit evidence explaining their business purpose, and the material weakness in internal control over financial reporting related to the gift or prepaid card business revenue transaction cycle provided sufficient basis for RSM to determine that the Ebix audit had high litigation risk, high audit risk, and/or high business risk that made RSM's further engagement or work on the audit untenable.

84.    RSM's resignation as independent auditor of Ebix in February of 2021, in the middle of an audit was a drastic measure. RSM stated in its letter dated February 22, 2021, filed with the SEC on February 23, 2021 that even if Ebix had provided the information sought by RSM related to the significant unusual transactions, RSM may have still decided to resign because such information may have "…materially impact[ed] the fairness or reliability of the

financial statements subject to RSM's audit."

85.    To take the dramatic step to resign, RSM evaluated the significant unusual transactions with no explained business purpose, Ebix's failure to provide sufficient and appropriate audit evidence explaining and justifying the transactions' business purpose, and the material weakness in internal control over financial reporting relating to the gift or prepaid card business revenue transaction cycle, and decided to resign, knowing that it was mid-February 2021, and the audit was not complete. The Individual Defendants knew or recklessly disregarded these circumstances and their materiality to stockholders yet failed to disclose them publicly.

### E.    The Board's Response to RSM's Resignation

86.    Following RSM's resignation on February 15, 2021, the Individual Defendants engaged K.G. Somani & Co. ("K.G. Somani") as the Company's replacement auditor on March 5, 2021. In a complete about-face from RSM's challenges, only one month and three weeks later, on April 27, 2021, K.G. Somani apparently determined it had obtained sufficient evidence to explain the business purpose behind the significant unusual transactions concerning Ebix's gift card business in India. Despite all of the concerns raised by RSM regarding the 2020 Ebix audit – concerns so serious that RSM had resigned, effectively walking away

from a lucrative engagement with a rapidly expanding client – K.G. Somani signed off on its new client's financial statements without a hint of trouble. A mere seven weeks after RSM's resignation, K.G. Somani provided Ebix with a clean, unqualified audit opinion without mentioning the material weakness in internal control identified by RSM or any remediation efforts.

87.     Pursuant to PCAOB AS 2610.09, the successor auditor should make specific and reasonable inquiries of the predecessor auditor regarding matters that will assist the successor auditor in determining whether to accept the engagement, and matters subject to inquiry should include, inter alia, the predecessor auditor's understanding of the nature of the company's relationships and transactions with related parties and significant unusual transactions. Thus, upon information and belief, K.G. Somani was well informed by RSM of the significant unusual transactions, their lack of business purpose, RSM's identification of a material weakness in internal control and the fact that Ebix failed to or could not provide, despite repeated inquiries by RSM, sufficient and appropriate audit evidence explaining and supporting the business purpose of these transactions.

88.     K.G. Somani is a firm based in India that according to its website has only seventeen (17) partners and two-hundred (200) staff across just six (6) practice groups, and only one (1) office located at 3/15, Asaf Ali Road, New Delhi,

110002, and upon information and belief, only one partner holding the certified public accountant ("CPA") designation and license who was well versed with GAAP.  RSM, however, according to its website, has dozens of offices in the U.S. and around the world, more than 11,000 employees, and provides dozens of accounting service offerings, including auditing, tax, and consulting. Yet K.G. Somani was able to review all of the significant unusual transactions identified by RSM, for which RSM was forced to resign due to insufficient audit evidence being available, determine their business purpose, complete Ebix's December 31, 2020 year-end audit, and issue a clean, unqualified opinion in a period of less than seven weeks without explaining the material weakness in internal control identified by RSM or any remediation efforts.

89.    Inexplicably, although Ebix failed to, or could not, provide RSM with the audit evidence and information necessary to explain the business purpose behind each significant unusual transaction identified by RSM relating to Ebix's gift card business in India, only weeks after RSM's resignation, by April 27, 2021, all of the serious issues that caused RSM to resign and surrender a lucrative engagement were apparently resolved by K.G. Somani, an auditing firm with far less resources and experience than RSM.

90.    K.G. Somani was miraculously able to accomplish what RSM – a firm

with far greater resources and experience – could not: obtain sufficient appropriate audit evidence from Ebix concerning each significant unusual transaction identified by RSM and issue a clean, unqualified audit opinion. Troublingly, K.G. Somani's clean opinion, dated April 27, 2021, did not even mention any material weakness in internal control or any remediation of the material weakness identified by RSM. The most compelling inference raised by this timeline and sequence of events is that, hampered by RSM's thorough audit that uncovered a multitude of accounting concerns, Ebix turned to an auditor which would not look too closely at the significant unusual transactions, lack of sufficient appropriate audit evidence, and material weakness in internal control, and instead deliver a clean audit opinion promptly to avoid NASDAQ delisting and to preserve the viability of the lucrative planned IPO of EbixCash.

91. The 2020 10-K explained that because of RSM's resignation without completing the 2020 audit and Ebix's failure timely to file the 2020 10-K, Ebix received a letter from The Nasdaq Stock Market LLC on March 2, 2021 informing it that it was not in compliance with the requirements for continued NASDAQ listing. The Individual Defendants knew that delisting would have a material negative effect on Ebix, its business, its shareholders and its planned IPO of EbixCash. In an effort to regain compliance by the April 16, 2021 deadline to

submit a plan to Nasdaq, Ebix quickly retained K.G. Somani, which produced a

clean audit opinion in record time, in view of RSM's reasons for resignation. With

respect to NASDAQ delisting, the 2020 10-K states:

> We are not in compliance with the requirements of Nasdaq for continued listing, and if Nasdaq does not concur that we have adequately remedied our non-compliance with Nasdaq Listing Rule 5250(c)(1), our common stock may be delisted from trading on Nasdaq, which could have a material adverse effect on us and our shareholders.

> On March 1, 2021, subsequent to the resignation of RSM from its position on February 15, 2021, we filed a Notification of Late Filing with the SEC pursuant to Rule 12b-25 of the Securities Exchange Act of 1934, as amended ("Rule 12b- 25"), indicating that we were unable, without unreasonable effort and expense, to finalize our 2020 Financial Statements by March 1, 2021, the filing due date to file the Company's Annual Report on Form 10-K for the year ended December 31, 2020 (the "2020 Form 10-K"). We indicated at the time that we intended to file the 2020 Form 10-K as soon as practicable, and would make every effort to file the 2020 Form 10-K within the fifteen-day extension period afforded by Rule 12b-25.

> On March 2, 2021, we received a notification letter from The Nasdaq Stock Market LLC ("Nasdaq") stating that, because the Company had not yet filed the 2020 Form 10-K, the Company was no longer in compliance with Nasdaq Listing Rule 5250(c)(1), which requires listed companies to timely file all required periodic financial reports with the SEC. Nasdaq's notification letter states that we have 45 calendar days, or until April 16, 2021, to submit to Nasdaq a plan to regain compliance with the Nasdaq Listing Rules. If Nasdaq accepts the Company's plan, then Nasdaq may grant the Company up to 180 days from the prescribed due date for filing the 2020 Form 10-K to regain compliance. If Nasdaq does not accept the Company's plan, then the Company will have the opportunity to appeal that decision to a Nasdaq hearings panel.

The Company has provided its plan to Nasdaq, and as described in more detail above, the Company has retained KGS as its independent registered public accounting firm to audit the Financial Statements. However, there can be no assurance that Nasdaq will concur that we have remedied our non-compliance with Listing Rule 5250(c)(1), in which case our common stock could remain subject to delisting by Nasdaq. If our common stock is delisted, there can be no assurance whether or when it would again be listed for trading on Nasdaq or any other securities exchange. Further, the market price of our shares could decline and become more volatile, and our shareholders might find that their investment in our shares has limited liquidity. Moreover, institutions whose charters forbid holding securities in unlisted companies might sell our shares, which could have a further adverse effect on the price of our stock.

92.     The Individual Defendants explained the potential material adverse effects of weakness in internal control in the 2020 10-K, thus confirming Ebix's need to obtain a clean, unqualified audit opinion on internal control from K.G. Somani—and quickly, by the fast approaching deadline for NASDAQ delisting. In Ebix's case, the widely touted planned IPO of EbixCash could be jeopardized by RSM's identification of a material weakness in internal control and Defendants knew that Ebix had to change the narrative quickly. The 2020 10-K acknowledges the materiality of a material weakness in internal control, stating in relevant part:

we may discover future deficiencies in our internal controls over financial reporting, including those identified through testing conducted by us or subsequent testing by our independent registered public accounting firm. If we are unable to meet the demands that have been placed upon us as a public company, including the requirements of the Sarbanes-Oxley Act, we may be unable to accurately report our financial results in future periods, or report them

within the timeframes required by law or stock exchange regulations. Failure to comply with the Sarbanes-Oxley Act, when and as applicable, could also potentially subject us to sanctions or investigations by the SEC or other regulatory authorities. Any failure to maintain or implement required new or improved controls, or any difficulties we encounter in their implementation, could result in additional material weaknesses or significant deficiencies, cause us to fail to meet our reporting obligations or result in material misstatements in our financial statements. If we cannot provide reliable financial reports or prevent fraud, our business and results of operations could be harmed, and investors could lose confidence in our reported financial information.

93.     RSM delivered a clean audit opinion on Ebix's 2019 financial statements, which was included in the 2019 Ebix Form 10-K filed with the SEC on March 2, 2020. This opinion included an "unqualified opinion on the effectiveness of the Company's internal control over financial reporting" and stated explicitly:

> We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2019, based on criteria established in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission in 2013, and our report dated March 2, 2020 expressed an unqualified opinion on the effectiveness of the Company's internal control over financial reporting.

94.     RSM's 2019 audit opinion was reissued in the 2020 10-K filed with the SEC on April 27, 2021, after RSM's resignation on February 15, 2021, and its disclosure of a material weakness related to Ebix's failure to design controls "over the gift or prepaid card revenue transaction cycle sufficient to prevent or detect a

material misstatement." Tellingly, however, the reissued version of the 2019 audit opinion was altered such that it deleted RSM's crucial language attesting to the effectiveness of Ebix's internal control over financial reporting. The language quoted above in the 2019 audit opinion appears nowhere in the reissued 2019 audit opinion included in Ebix's 2020 10-K.

95.    This deletion speaks volumes and was approved by the entire Board, each member of whom signed the 10-K. RSM's omission of its 2019 unqualified opinion on the effectiveness of Ebix's internal control over financial reporting in the reissued version filed in the 2020 10-K was intentional and not coincidental or accidental. In the context of RSM's resignation as Ebix's auditor, in part as a result of finding a material weakness in internal control, the reissued 2019 opinion omitting any reference to internal control raises an inference that the material weakness disclosed by RSM in its February 15, 2021 resignation letter may be more extensive than disclosed in that resignation letter. At the very least, the omission of such language in RSM's reissued 2019 opinion raises an inference that RSM was no longer comfortable with its prior unqualified opinion on internal control for the previous fiscal year of 2019 or opining on Ebix's internal control at all.

### F.      The Audit Committee Defendants' Knowledge

96.     Defendant Raina, as Ebix's President, CEO, and Chairman of the Board, and the "single" visionary leader of Ebix, had an oversight duty with respect to Ebix's internal control over financial reporting, and the Audit Committee Defendants (Benz, Bhalla and Keller) were obligated to monitor the effectiveness of Ebix's internal control over financial reporting and assist and communicate with the Board, including defendant Raina, and defendant Hamil as CFO, in such monitoring. The serious issues raised by RSM during the course of its audit were well within the scope of the oversight duties of the Audit Committee Defendants to "[r]eview with the Auditors and the Company's management their findings on the adequacy and effectiveness of internal controls and their recommendations for improving the internal control environment". As a result of their communication and interaction with the Audit Committee, defendants Raina and Hamil knew or recklessly disregarded the existing material weakness in internal control and RSM's inability to obtain sufficient appropriate audit evidence for significant unusual transactions in the gift card business, despite repeated requests for such evidence.

97.     The Audit Committee's principal responsibility is to assist the Board in its general oversight of Ebix's financial reporting, internal controls, ethics

compliance and audit functions. The Audit Committee Charter states its purpose as follows:

> The Audit Committee (the "Committee") of the Board of Directors (the "Board") of Ebix, Inc. (the "Company") shall oversee the Company's accounting and financial reporting processes and the audits of the Company's financial statements, and shall otherwise exercise oversight responsibility, and assist the Board in fulfilling its oversight functions, with respect to matters involving the accounting, auditing, financial reporting and internal control functions of the Company. In so doing, it shall be the goal of the Committee to maintain free and open means of communication between the members of the Board, the Company's independent public accountants who audit the Company's financial statements (the "Auditors") and the Company's financial management. While it is not the Committee's responsibility to certify the Company's financial statements or to guarantee the Auditors' report, the Committee will facilitate discussions among the Board, the Auditors and the Company's management. (Emphasis added).

98.    The Audit Committee Charter states that one of the Audit Committee's functions is "reviewing internal controls established by management." The Audit Committee discusses with the independent registered public accounting firm the matters required to be discussed under auditing standards generally accepted in the United States, including those matters set forth in Statement on Auditing Standards No. 1301 (Communication with Audit Committees), as currently in effect. The Audit Committee also receives from, and discusses with, its independent registered public accounting firm the matters required to be discussed under the applicable requirements of the PCAOB, the SEC

and the Audit Committee's charter.

99.    The Audit Committee Charter requires its members to:

   a. "[m]eet with the Auditors and the Company's management to discuss, review and comment upon the interim financial statements to be included in each of the Company's Quarterly Reports on Form 10-Q prior to the public announcement of financial results and the filing of the Form 10-Q with the SEC.);"

   b.  "[b]e directly responsible for the appointment, compensation, retention and oversight of the work of the Auditors, including resolution of disagreements between management and the Auditors regarding financial reporting, for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company. The Auditors shall report directly to the Committee;"

   c.  "[i]nquire of the Auditors and the Company's management about significant risks or exposures and assess the steps which management has taken to minimize such risks and monitor control of these areas;"

d.  "[r]eview with the Auditors and the Company's management their findings on the adequacy and effectiveness of internal controls and their recommendations for improving the internal control environment, including management's controls and security procedures with respect to the Company's information systems;"

e.  "[e]stablish procedures for the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters;" and

f.  "[c]onduct or authorize investigations into any other matters within the Committee's scope of responsibilities."

100.  The Audit Committee Charter further states that "[t]he Committee plays a critical role in serving as a check and balance for the Company's financial reporting system. In carrying out its functions, the Committee's goal is to help ensure that management properly develops and adheres to a sound system of internal controls and that the Auditors, through their own review, objectively assess the Company's financial reporting practices."

101.  The mandated responsibilities and goals of the Audit Committee, as

stated in its Charter, raise a strong inference that RSM's inability to obtain sufficient appropriate audit evidence of significant unusual transactions in the gift card and prepaid card business in India, despite repeated requests, and its identification of a material weakness in internal control were highly significant topics discussed by the Audit Committee Defendants, the full Board, and defendants Raina and Hamil during the course of RSM's 2020 audit, thus providing the Individual Defendants with actual knowledge of RSM's frustrations and resulting conclusions, to which they turned a blind eye.

## VI.   THE TRUTH IS REVEALED

102.   On February 19, 2021, Ebix revealed that RSM resigned "as a result of being unable, despite repeated inquiries, to obtain sufficient appropriate audit evidence that would allow it to evaluate the business purpose of significant unusual transactions that occurred in the fourth quarter of 2020" related to the Company's gift card business in India. RSM had also stated that there was a material weakness related to Ebix's failure to design controls "over the gift or prepaid card revenue transaction cycle sufficient to prevent or detect a material misstatement." In addition, Ebix and RSM disagreed over the accounting treatment of $30 million that had been transferred into a commingled trust account of Ebix's outside legal

counsel in December 2020. Specifically, in a Form 8-K filed with the SEC, the

Company stated, in relevant part:

> RSM informed the Company that there was a disagreement under Item 304(a)(1)(iv) of Regulation S-K with respect to the classification of $30 million. In connection with a pending acquisition, in December 2020 the Company transferred $30 million to a commingled trust account of its outside legal counsel that was not under the direct control of the Company, and classified the funds as a cash or cash equivalent on its balance sheet. RSM discussed with the Company RSM's view that these funds could not be classified as a cash or cash equivalent but could be classified as other current assets. There was no dispute that the $30 million was owned by the Company and would be classified as part of current assets included in the financial statements.

*    *    *

> On February 15, 2021, RSM told the Chairman of the Company's Audit Committee during a telephone call that RSM was resigning as the Company's independent registered public accounting firm, effective immediately. RSM then advised the Chairman on the call that it was resigning as a result of being unable, despite repeated inquiries, to obtain sufficient appropriate audit evidence that would allow it to evaluate the business purpose of significant unusual transactions that occurred in the fourth quarter of 2020, including whether such transactions have been properly accounted for and disclosed in the financial statements subject to the Audit. RSM informed the Chairman that the unusual transactions concerned the Company's gift card business in India. RSM asserts that on that call it further advised the Chairman that if this requested information was further investigated it might materially impact the fairness or reliability of the financial statements subject to the audit or affect RSMs willingness to be associated with the Company's financial statements, but that since RSM had resigned, no further investigation would occur. The Chairman discussed with RSM the reasons for its resignation.

Promptly following the call between RSM and the Chairman of the Audit Committee, RSM sent the resignation letter dated February 15, 2021. RSM stated in its resignation letter that it was "resigning as a result of being unable, despite repeated inquiries, to obtain sufficient appropriate audit evidence that would allow it to evaluate the business purpose of significant unusual transactions that occurred in the fourth quarter of 2020, including whether such transactions have been properly accounted for and disclosed in the financial statements subject to the Audit." RSM informed the Company that the unusual transactions concerned the Company's gift card business in India. RSM also stated in its letter that it believed that the Company's "internal control over financial reporting was not effective as of December 31, 2020 due to the identification of a material weakness. Specifically, management did not design or implement the necessary procedures and controls over the gift or prepaid card revenue transaction cycle sufficient to prevent or detect a material misstatement." RSM further stated in the letter that, "because we have not completed the Audit, we cannot conclude on other control deficiencies that may rise to the level of a material weakness."

103.   On this news, the Company's share price plummeted $20.24 per share, or approximately 40%, to close at $30.50 on February 22, 2021, on abnormally heavy trading volume.

104.   On February 22, 2021, in an effort to confront the fallout from RSM's abrupt resignation and spin the narrative to its advantage, the Individual Defendants caused Ebix to issue a press release reaffirming its business outlook for 2021 and thereafter. In this release, the Individual Defendants downplayed the significance of Ebix's gift card business and its materiality to the Company's financial statements. Additionally, they reassured stockholders that "[n]o one has

made any such aspersion [of fraud or wrongdoing] in any manner whatsoever. The Company is not aware of any wrongdoing in any manner nor is aware of any such aspersion being made by anyone." The release also manipulated the meaning of "significant unusual transactions" by characterizing it as the 95% growth in the gift card business and further took the opportunity to attempt to distract stockholders from the extraordinary event of an auditor resignation by providing an update on the planned IPO for EbixCash:

### Ebix Reaffirms Business Outlook for 2021 and Beyond

JOHNS CREEK, GA – February 22, 2021 – Ebix, Inc. (NASDAQ: EBIX), a

leading international supplier of On-Demand software and E-commerce services to the insurance, financial, healthcare and e-learning industries, today reaffirmed a positive outlook for the year 2021 and beyond.

The Company decided to issue this release in response to investor questions over the weekend. The Company asserted the following in response to specific questions

•       How is the Company's financial health? - The Company's financial health is in better shape than ever, as reflected in our operating cash flows through the end of 2020. The Company continues to generate strong cash flows. As of 15th February 2020, the Company's cash and cash equivalents (including any restricted cash) amounted to greater than $140 million, including the $30 million earmarked for a new US acquisition that is back in Ebix's operating bank account.

•       When is the EbixCash IPO targeted for? The Company is targeting the EbixCash IPO towards the end of 2021, in consultation

with its investment bankers.

• Does the Company suspect any fraud or wrongdoing? Has any such aspersion been made by anyone? No one has made any such aspersion in any manner whatsoever. The Company is not aware of any wrongdoing in any manner nor is aware of any such aspersion being made by anyone.

• What is the income materiality of the Gift card business? As elaborated in our previous press release, the unaudited operating income from our gift card business was less than $1.4 million for the full year 2020 and less than $1 million for Q4 2020. The Company believes that the accounting, including for our gift card business, is consistent with GAAP.

• Does the gift card business involve extending payment terms to EbixCash customers? Over 95% of the sales of gift cards do not involve extending payment terms to EbixCash's corporate customers. Payments are collected concurrently with the issuance of the gift cards and the gift cards are not activated until the upfront payment for the cards is received. There are a small number of corporate customers that are multi-solution or multi-service partners of EbixCash that the Company has extended payment terms to related to gift card purchases, but those sales represent a small percentage of overall gift card sales (less than 5%).

• Was the $30 million amount earmarked for a past acquisition or a new acquisition? What geography was the acquisition targeted in? Does the classification of the $30 million in any way have any impact on operating cash flows? The $30 million amount was earmarked for a new software industry acquisition in the United States. The treatment of the cash amount is a balance sheet classification determination and has no impact on the operating cash flow of the Company.

• Is the 95% growth in gift card business in Q4 2020 "unusual"? The term "significant unusual transactions" is an accounting term, defined as "a transaction that is outside the normal course of business for the company or that otherwise appears to be unusual due to its

timing, size, or nature." In this regard, we note that our gift card business revenues grew substantially in Q4 2020. The increase in gift card revenues was driven by the increased use of digital money in India during the COVID-19 pandemic and the renewed push by the Company to grow its payment solutions business.

105.   The following day, on February 23, 2021, the Individual Defendants caused Ebix to disclose in a filing with the SEC that RSM had furnished the Company with a letter, addressed to the SEC and dated February 22, 2021, in which RSM identified aspects of Ebix's February 19, 2021 disclosure (regarding the resignation of RSM) with which it disagreed. Indeed, RSM disagreed with significant characterizations by the Individual Defendants of the dispute with RSM. In the February 22 letter, RSM conveyed to the SEC, in pertinent part, that:

> We are writing to you in response to the request of Ebix, Inc. (the "Company") pursuant to Item 304(a)(3) of Regulation S-K of the rules and regulations of the Securities and Exchange Commission ("Regulation S-K"), regarding the Current Report on Form 8-K of the Company (the "8-K") filed with the Securities and Exchange Commission on February 19, 2021. Specifically, RSM US LLP ("RSM" or the "Firm") agrees, and does not agree, with certain statements concerning our Firm set forth in Item 4.01 of the 8-K, as described below. To the extent we do not discuss or comment on other statements contained therein, we have no basis to agree or disagree. RSM was not requested by the Company to comment, and RSM does not comment, on the press release issued by the Company on the same date it filed the 8-K entitled "Ebix Shares Strong Business Outlook and Discusses Recent Events."
>
> *      *      *
>
> RSM agrees with the first sentence in the first paragraph, but

otherwise disagrees with certain statements made in the two paragraphs in the section entitled "1: Disagreements Under Item 304(a)(1)(iv) of Regulation S-K." RSM disagrees that this issue was an initial difference of opinion based on incomplete facts or preliminary information rather than a disagreement pursuant to Item 304(a)(i)(iv). RSM repeatedly told the Company that the $30 million that the Company transferred on December 31, 2020 to an account of its outside legal counsel could not be classified as a cash or cash equivalent on its balance sheet. RSM stated this because the $30 million was transferred in connection with a pending acquisition to a commingled trust account that was not under the direct control of the Company. At the time of RSM's resignation, the Company had not communicated that it accepted RSM's position. In addition, RSM did not tell the Company these funds could be classified as "other current assets," nor did RSM concur that the $30 million was "owned by the Company."

RSM agrees with the first and last sentence, but otherwise disagrees with certain statements made in the Company's 8-K disclosure in the first paragraph of the section entitled "2: Reportable Events Under Item 304(a)(1)(v)." In its disclosure, the Company states: "RSM asserts that on that call it further advised the Chairman that if this requested information was further investigated it might materially impact the fairness or reliability of the financial statements subject to the audit or affect RSMs willingness to be associated with the Company's financial statements, but that since RSM had resigned, no further investigation would occur." (emphasis supplied). RSM disagrees with the use of the term "asserts" to the extent it could create uncertainty as to what RSM communicated. In the call that occurred between RSM and the Chairman of the Company's Audit Committee on February 15, 2021, RSM stated clearly and unequivocally that if the information repeatedly requested by RSM — but which was not provided by the Company — related to gift cards issued by ItzCash/EbixCash in the fourth quarter of 2020 was further investigated, it might materially impact the fairness or reliability of the financial statements subject to RSM's audit or affect RSM's willingness to be associated with the Company's financial statements, and that, as a result of RSM's resignation, further investigation has

not occurred.

106.   Despite the Individual Defendants' attempts to reassure stockholders as to the sufficiency of Ebix's internal control over financial reporting and the reliability of its accounting, Ebix's shares have remained depressed far below the pre-disclosure price. Having fallen from a closing price of $50.74 on February 19, 2021 to $23.20 per share on February 23, 2021, Ebix shares have, in the five months since, generally traded at prices below $35 per share and, indeed, often below $30 per share.  The Company's stock price is currently trading for less than $32 per share.

### VII.   THE INDIVIDUAL DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT PERIOD

#### A.   False and Misleading 2Q20 10-Q

107.   On November 9, 2020, the Individual Defendants caused Ebix to file its 3Q20 10-Q, stating in relevant part:

> We monitor and evaluate on an ongoing basis our disclosure controls and procedures in order to improve their overall effectiveness. In the course of these evaluations, we modify and refine our internal processes and controls as conditions warrant.

> Our management, including our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our "disclosure controls and procedures" (as defined in Rule 13a-15(e) promulgated under the Exchange Act) as of September 30, 2020. Based on this evaluation the Company's Chief Executive Officer and Chief Financial Officer have concluded that these disclosure controls and

procedures are effective. There were no changes in our internal control over financial reporting during the quarter ended September 30, 2020 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. We have not experienced any material changes to our internal controls over financial reporting despite the fact that all non-essential employees are working remotely due to the COVID- 19 pandemic. We are continually monitoring the impact of COVID-19 on the operating effectiveness of our internal control over financial reporting.

108.   The statements that "we modify and refine our internal processes and controls as conditions warrant," and "there were no changes in our internal control over financial reporting" and "[w]e have not experienced any material changes to our internal controls over financial reporting" were materially false and misleading when made and omitted the material fact that there was a material weakness during 3Q20 in internal control over financial reporting in the gift card and prepaid card business in India, which had experienced astronomical growth in the third quarter of 2020, in part because the COVID-19 pandemic motivated people to use digital rather than in-person payment solutions; changes in regulations by the Reserve Bank in India; Ebix's increased marketing efforts for the prepaid and gift card business; and the Individual Defendants' knowledge that "malicious" third parties were taking advantage of the surge in digital use to commit digital fraud and that Ebix was a potential target. At the same time, the COVID-19 pandemic devastated India and had a material negative impact on the effectiveness of Ebix's staff

because "all non-essential employees are working remotely due to the COVID-19 pandemic." Ebix's disparate accounting systems for its various businesses, including a separate accounting system for EbixCash in India, resulted in a "broken" accounting system, according to a confidential witness. This "perfect storm" of skyrocketing growth in the gift and prepaid card business and other factors listed above, coupled with the diminished ability of Ebix's staff to account for the burgeoning transactions in that business, created a material weakness in internal control over financial reporting during 3Q20 which was a material fact that should have been disclosed to stockholders. Contrary to Defendants' reassurance that "we modify and refine our internal processes and controls as conditions warrant," the Individual Defendants did not modify internal control at all or sufficiently to account for then existing conditions, nor did they disclose to stockholders that significant unusual transactions could not be properly accounted for with sufficient appropriate audit evidence. These material facts were concealed from stockholders, despite the Individual Defendants' admission that they were "continually monitoring the impact of COVID-19 on the operating effectiveness of our internal control over financial reporting" and their knowledge of rampant potential fraud, as stated in the 2020 10-K, that "[m]alicious third parties are using increasingly sophisticated methods to engage in illegal activities such as identity

theft, fraud and paper instrument counterfeiting."

109.   As alleged herein, the 3Q20 10-Q contained certifications pursuant to SOX signed by defendants Raina and Hamil attesting to the accuracy of the financial statements, the effectiveness of internal control, and the disclosure of all fraud. In their SOX certifications, both defendants Raina and Hamil attest to the fact that they "designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles" and then certified that internal control was effective. They further certified that the 3Q 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading" and that "information contained in the Report fairly presents, in all material respects, the financial condition and results of operations" of Ebix. These statements were materially false and misleading and omitted the material fact that there was a material weakness during 3Q20 in internal control over financial reporting in the gift card business in India at the time that defendants Raina and Hamil signed their SOX Certifications for the reasons alleged above.

Defendants Raina and Hamil failed to disclose what they knew or recklessly disregarded was a material unremedied internal control weakness—so serious that Ebix's auditor, RSM, resigned before completing the 2020 audit as a result of its inability to obtain sufficient appropriate audit evidence of significant unusual transactions in the gift card business in India, despite repeated requests for such evidence which Ebix failed to provide. These SOX certifications were false when made and omitted the material facts that defendants Raina and Hamil knew or recklessly disregarded that 3Q20 internal control was not effective to detect fraud or explain significant unusual transactions, as confirmed when RSM publicly identified a material weakness and resigned because of its repeated requests for sufficient appropriate audit evidence.

110.  In addition, the SOX certifications falsely attested that defendants Raina and Hamil had disclosed, "based on our most recent evaluation of internal control over financial reporting, to the **registrant's auditors and the audit committee of the registrant's board of directors**:

> **all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information."** (Emphasis added).

111.  This certification confirms that the Audit Committee Defendants --

Benz, Bhalla and Keller -- were kept informed of Ebix's undisclosed internal control problems.

112.   In stark contrast to what defendants Raina and Hamil stated in their SOX certifications, they did not inform RSM of any material weakness in internal control on or before November 9, 2020. Rather, RSM had to make repeated requests for sufficient appropriate audit evidence which Ebix failed to provide, causing RSM to resign before completing the 2020 audit. RSM's February 15, 2021 resignation letter caused the Individual Defendants to disclose publicly for the first time, and which RSM reiterated subsequently in its February 22, 2021 letter what defendants Raina and Hamil knew or recklessly disregarded at the time of their false statements on November 9, 2020—the existence of a material weakness in 3Q20 related to Ebix's failure to design controls "over the gift or prepaid card revenue transaction cycle sufficient to prevent or detect a material misstatement." This material weakness existed during 3Q20 and was known or recklessly disregarded by defendants Raina and Hamil on November 9, 2020 as a result of "continually" monitoring internal control in the context of the COVID-19 pandemic; skyrocketing 3Q20 growth in EbixCash occurring with a workforce of diminished capacity and at the same time that key competitors were losing money.

## VIII.  DAMAGES TO EBIX

113.   Ebix has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

114.   As a direct and proximate result of the Individual Defendants' conduct, Ebix has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

   a. legal fees associated with the lawsuits filed against Ebix and defendants Raina and Hamil for violations of the federal securities laws, including the Securities Action[1];

   b. legal fees associated with the *Yatra* Action against Ebix for violations of Delaware law;

   c. loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Individual Defendants' false statements and lack of candor to the marketplace;

   d. amounts paid to outside lawyers, accountants, and investigators in connection with investigations, including but

---

[1]       Unsurprisingly, the events described herein led to the filing of a federal securities fraud class action lawsuit against the Company and defendants Raina and Hamil.  *See Suraf v. Ebix, Inc. et al.*, Case No. 21-cv-01589-JMF (S.D.N.Y.) (the "Securities Action"). The Securities Action remains pending.

not limited to any ongoing or future SEC, DOJ, and/or IRS investigation(s);

e.  costs associated with changing auditors, including the double payment of audit fees to two audit firms (RSM and K.G. Somani) for the Company's 2020 audit; and

f.  loss of revenues and profits.

## IX.    DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

115.   Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

116.   Plaintiff is a current shareholder of the Company, was a shareholder of the Company at the time of the Individual Defendants' wrongdoing alleged herein and has been a shareholder of the Company continuously since 2013.

117.   Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

118.   As a result of the facts set forth herein, Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously pursue this action.

119.   The Board currently consists of seven (7) directors: Raina, Benz, Herter, Eckert, Bhalla, Keller and Hebard.   Under Delaware law, a derivative plaintiff need only demonstrate reason to doubt that half of the directors are disinterested or lack independence in order to establish pre-suit demand excusal. Plaintiffs have adequately alleged that there is reason to doubt that at least four (4) current directors of Ebix are capable of disinterestedly and/or independently considering a demand to commence and vigorously prosecute this action, for the following reasons:

### A.   Defendant Raina is Not Independent

120.   Defendant Raina is incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action because defendant Raina's principal professional occupation is his longtime employment as President and CEO of the Company.

121.   Accordingly, defendant Raina is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action against those Individual Defendants who control his annual compensation. Per NASDAQ rules defendant Raina is not independent, and indeed the Company's Proxy Statements on Form DEF 14A admit that defendant Raina is not independent.

**B.**     **The Audit Committee Defendants Face A Substantial**
**Likelihood of Liability, Excusing Demand**

122.   The three Audit Committee Defendants -- Benz, Bhalla, and Keller –
each served as the members of the Audit Committee at relevant times during the
misconduct alleged herein. As such, they are responsible for the effectiveness of
the Company's internal controls, the integrity of its financial statements, and its
compliance with laws and regulations. In their capacities as Audit Committee
members, the Audit Committee Defendants reviewed and approved the disclosures
regarding the Company's internal control over financial reporting and Ebix's
financial statements. The Audit Committee Defendants failed to ensure the
integrity of the Company's internal controls, allowing a series of materially
misleading statements to be disseminated in Ebix's SEC filings and other
disclosures. Most importantly, sworn SOX certifications submitted by defendants
Raina and Hamil confirm that they were informed of all material issues regarding
the Company's interactions with the Company's auditors, including RSM.  Thus,
the Audit Committee Defendants each face a substantial likelihood of personal
liability for breaching their fiduciary duties. Therefore, there is reason to doubt that
defendants Benz, Bhalla and Keller are disinterested, and demand is excused as to
each of them.

# COUNT I

## Breach of Fiduciary Duty Against the Individual Defendants

123.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

124.   The Individual Defendants, as current or former Ebix officers and/or directors, owe (or owed) the Company the fiduciary duties of due care, loyalty, good faith, candor, oversight, reasonable inquiry, and supervision.

125.   By virtue of their positions as Ebix directors and/or officers, these Individual Defendants at all relevant times had the power to (and did) control, influence, and cause the Company to engage in the practices complained of herein, including the false and misleading statements alleged herein.

126.   Each Individual Defendant was required to: (a) use his or her ability to control and manage Ebix in a fair, just, and equitable manner; and (b) act in furtherance of the best interests of Ebix rather than his or her own interests.

127.   By their acts alleged herein, including but not limited to causing Ebix to issue false and misleading statements while concealing material adverse information and failing to ensure that the Company maintained adequate internal controls regarding financial disclosures, the Individual Defendants each breached their fiduciary duties.

128.    The Individual Defendants acted in bad faith, willfully, and/or recklessly in violating their fiduciary duties owed to the Company.

129.    Ebix has been injured as a direct and proximate result of the Individual Defendants' wrongful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.      Against all the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.      Directing Ebix to take all necessary actions to reform and improve its corporate governance and internal procedures to comply witafth applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.     Awarding to Ebix restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:        November 5, 2021.          Respectfully submitted,

**HOLZER & HOLZER, LLC**
/s/*Marshall P. Dees*
Corey D. Holzer
Ga. Bar No. 364698
Marshall P. Dees
Ga. Bar No. 105776
Joshua A. Karr
Ga. Bar No. 202783
211 Perimeter Center Parkway, Suite 1010
Atlanta, GA 30346
(770) 392-0090
cholzer@holzerlaw.com
mdees@holzerlaw.com
jkarr@holzerlaw.com

*Attorneys for Plaintiff*

*Of counsel*:

**SHUMAN, GLENN & STECKER**
Brett D. Stecker
326 W. Lancaster Avenue
Ardmore, PA 19003
(303) 861-3003
brett@shumanlawfirm.com

Rusty E. Glenn
600 17th Street, Suite 2800 South
Denver, CO 80202
(303) 861-3003
rusty@shumanlawfirm.com

*Attorneys for Plaintiffs*